# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| LOCAL 727, INTERNATIONAL BROTHERHOOD OF TEAMSTERS, | ) ) ) | |
| Plaintiff, | ) ) ) | No. 10 C 3484 |
| v. | ) ) | |
| METROPOLITAN PIER AND EXPOSITION AUTHORITY and JAMES REILLY, as Trustee of the Metropolitan Pier and Exposition Authority, | ) ) ) ) ) ) | |
| Defendants. | ) ) | |
| CHICAGO REGIONAL COUNCIL OF CARPENTERS, | ) ) ) | No. 10 C 3372 (related) |
| v. | ) ) | Judge Ronald A. Guzmán |
| JAMES REILLY, as Trustee of the Metropolitan Pier and Exposition Authority and METROPOLITAN PIER AND EXPOSITION AUTHORITY, | ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Local 727, International Brotherhood of Teamsters ("Local 727") and Chicago Regional Council of Carpenters ("Carpenters") have sued defendants Metropolitan Pier and Exposition Authority and its Trustee, James Reilly, alleging that recent amendments to the Metropolitan Pier and Exposition Authority Act, 70 Ill. Comp. Stat. 210/5.4, are preempted by the National Labor Relations Act or otherwise violate federal and state law. The parties to each suit have filed cross-

motions for summary judgment pursuant to Federal Rule of Civil Procedure ("Rule") 56. For the reasons set forth below, the Court: (1) grants in part, denies in part and strikes as moot in part both plaintiff's and defendants' motions in the Local 727 suit; and (2) grants in part and strikes as moot in part plaintiff's motion and denies in part and strikes as moot in part defendants' motion in the Carpenters' suit.

## Facts

The Metropolitan Pier and Exposition Authority ("MPEA") is a unit of local government created to promote business, commerce and tourism in Illinois. 210 Ill. Comp. Stat. 210/3; (Defs.' Resp. Carpenters' LR 56.1(a) Stmt. Facts ¶¶ 6-7; Local 727's Resp. Defs.' Stmt. Add'l Facts ¶ 1.) Defendant Reilly is its Trustee. (Defs.' Resp. Carpenters' LR 56.1(a) Stmt. Facts ¶ 4; Local 727's Resp. Defs.' Stmt. Add'l Facts ¶ 46.) The MPEA owns and operates McCormick Place, a convention center in Chicago that was built and renovated with state bond money and is used primarily for trade shows. 70 Ill. Comp. Stat. 210/5.4(a)(6); (Defs.' Resp. Carpenters' LR 56.1(a) Stmt. Facts ¶¶ 7-8; Local 727's Resp. Defs.' Stmt. Add'l Facts ¶ 1.)

There are a number of players in the trade show business – MPEA, the trade show manager ("show manager"), the trade show contractors ("show contractors"), the trade show exhibitors ("exhibitors"), the exhibitor-appointed contractors ("EACs") and the unions – some of whom have little, if any, interaction with the others. (Defs.' Mem. Resp. Carpenters' Mot. Prelim. Inj., Ex. D, Mem. from Reilly to Jt. Comm. MPEA of 3/23/10 ["3/23/10 Mem."] at 4; Defs.' Resp. Local 727's Mot. Prelim. Inj., Ex. B4, 4/28/10 MPEA Legislative Analysis C.H. Johnson Consulting, Inc. at 1-3; *id.*, Ex. D1, Chicago Convention Crisis: A Vacuum of Leadership in the Hospitality Industry,

UNITE HERE Local 1; Defs.' Resp. Carpenters' LR 56.1(a) Stmt. Facts ¶¶ 8-11, 24; Local 727's Resp. Defs.' Stmt. Add'l Facts ¶¶ 3-4, 7-8.) The MPEA leases facility space to the show manager and provides food, parking and utility services to the show manager and exhibitors. (Defs.' Mem. Resp. Carpenters' Mot. Prelim. Inj., Ex. D, 3/23/10 Mem. at 4; Defs.' Resp. Carpenters' LR 56.1(a) Stmt. Facts ¶¶ 7-8; Local 727's Resp. Defs.' Stmt. Add'l Facts ¶¶ 3, 7.) The show manager subleases the space to the exhibitors and hires a show contractor to move the exhibitors' materials into and around the facility and to set up and dismantle the exhibitors' booths and the common elements of the show. (Defs.' Mem. Resp. Carpenters' Mot. Prelim. Inj., Ex. D, 3/23/10 Mem. at 4; Local 727's Resp. Defs.' Stmt. Add'l Facts ¶¶ 3, 7; Defs.' Resp. Carpenters' LR 56.1(a) Stmt. Facts ¶¶ 8-9.) The exhibitors supervise the show contractor's construction of their booths or hire an EAC to do so. (Defs.' Mem. Resp. Carpenters' Mot. Prelim. Inj., Ex. D, 3/23/10 Mem. at 4; Local 727's Resp. Defs.' Stmt. Add'l Facts ¶ 8; Defs.' Resp. Carpenters' LR 56.1(a) Stmt. Facts ¶¶ 9, 11.) The show contractors and EACs hire plaintiffs and other unions to do the work. (Defs.' Mem. Resp. Carpenters' Mot. Prelim. Inj., Ex. D, 3/23/10 Mem. at 4; Local 727's Resp. Defs.' Stmt. Add'l Facts ¶ 4; Defs.' Resp. Carpenters' LR 56.1(a) Stmt. Facts ¶ 10.)

Trade show work at MPEA is governed by a number of contracts: (1) a collective bargaining agreement ("CBA") between Local 727 and the show contractors/EACs ("Trade Show Agreement"); (2) a CBA between Carpenters and the show contractors/EACs ("Area Agreement"); (3) a CBA between Local 727 and MPEA governing MPEA's receiving clerks and assistant supervisors ("Local 727-MPEA CBA"); and (4) an agreement between MPEA, Carpenters and the show contractors that, in essence, modifies certain wage and work jurisdiction terms of the Area Agreement ("Side Letter Agreement"). (*See* Local 727 LR 56.1(a) Stmt. Facts, Ex. B, Trade Show

Agreement; *id.*, Ex. A, Agreement Between MPEA & Local 714; *id.*, Ex. C, 3/9/09 Letter of Understanding; Carpenters' Mem. Supp. Mot. Prelim. Inj., Ex. C, Area Agreement; *id.*, Ex. B, McLaughlin Decl. ¶¶ 1-5; *id.*, Ex. D, 6/1/08 Side Letter Agreement; *id.*, Ex. E, 12/21/00 Labor Agreement for MPEA; Local 727's Resp. Defs.' Stmt. Add'l Facts ¶¶ 4-6, 8; Defs.' Resp. Carpenters' LR 56.1(a) Stmt. Facts ¶ 10; Defs.' Stmt. Add'l Facts [Carpenters] ¶ 8.)

Historically, the MPEA has serviced its debt and funded its operations with tax revenue generated by the trade shows held at its facilities. *See* 70 Ill. Comp. Stat. 210/5.4(a)(7). In recent years, however, that revenue has fallen sharply, forcing MPEA to use general tax funds to pay its debt and to raise the prices of its services to generate operating funds. *See id.* 210/5.4(a)(8); (Defs.' Mem. Resp. Carpenters' Mot. Prelim. Inj., Ex. B, 4/29/10 MPEA Interim Bd. Report ["Board Report"] § 3.)

In late 2009: (1) the Healthcare Information and Management Systems Society, whose trade show at McCormick Place generated $50 million in local spending annually, decided to hold its 2012 show in Las Vegas; (2) the Society of Plastics Industry Inc., whose previous trade shows at McCormick Place had generated $95.3 million in revenue, decided to hold its 2012 and 2015 shows in Orlando; (3) the International Dairy Foods Association said its 2010 show would be held in Dallas, not Chicago; and (4) the National Restaurant Association, which generates $106 million in revenues annually, and the International Home and Housewares Show, which generates about $75 million in revenues, announced that they were considering moving their shows from Chicago. (Local 727's Resp. Defs.' Stmt. Add'l Facts ¶¶ 14-18, 32-33; Carpenters' Resp. Defs.' Stmt. Add'l Facts ¶¶ 30-32; Local 727's LR 56.1(a) Stmt. Facts, Ex. Z & Mem. Resp. Carpenters' Mot. Prelim. Inj., Ex. B, Board Report § 2.) The primary complaints of these groups and others who have held

4

trade shows at McCormick Place are that the costs of union labor and MPEA's services are too high. (Defs.' Mem. Resp. Carpenters' Mot. Prelim. Inj., Ex. B, Board Report §§ 3, 5; *id.*, Ex. D, 4/1/10 Jt. Comm. MPEA at 11-13, 20-25 (testimony of National Restaurant Association, International Housewares Association, Society of Manufacturing Engineers, Graphic Arts Show Company); Local 727's Resp. Defs.' Stmt. Add'l Facts ¶¶ 32-33.)

In response, the Illinois Legislature created the MPEA Interim Board of Directors and ("Board") and directed it to develop recommendations for improving MPEA's operations. (Local 727's Resp. Defs.' Stmt. Add'l Facts ¶ 23; Carpenters' Resp. Defs.' Stmt. Add'l Facts ¶ 39.)[1] In April 2010, the Board recommended that MPEA: (1) restructure its debt to create an operating fund that would allow it to stop marking up the food and utility services it required exhibitors to use to generate cash; (2) institute labor reforms and give exhibitors the same "rights" to move their materials into, out of and around McCormick Place as they have at competing venues; (3) end its subsidy of the Chicago Convention and Tourism Bureau ("CCTB") and launch its own marketing efforts; and (4) change its "convoluted" governance structure. (Defs.' Mem. Resp. Carpenters' Mot. Prelim. Inj., Ex. B, Board Report §§ 1-3, 5-6; Local 727's Resp. Defs.' Stmt. Add'l Facts ¶ 26.)

In May 2010, the state acted on some of these recommendations. It passed legislation that restructured MPEA's debt, allowing MPEA to stop marking up its services, and permitted exhibitors to obtain food and electrical service from outside vendors. *See* 70 Ill. Comp. Stat. 210/5.4(c)(15), (17), 210/13.2; 30 Ill. Comp. Stat. 105/8.25f; 35 Ill. Comp. Stat. 105/9, 110/9, 115/9, 120/3. Debt restructuring was a step "of paramount importance," the Board said, because

---
[1]The Court overrules Carpenters' relevancy objection to the facts asserted by defendants in this paragraph of their statement of additional facts.

5

MPEA's mark-ups made its "utility and food services charges . . . significantly higher" than those at other venues and was a "principal reason why [MPEA had] lost its competitive edge." (Defs.' Mem. Resp. Carpenters' Mot. Prelim. Inj., Ex. B, Board Report § 3.)

The state also added an exhibitors' rights provision to the MPEA Act "[to] ensure that . . . [MPEA's] facilities remain economically competitive with other convention venues . . . by reducing costs for exhibitors and show managers." 70 Ill. Comp. Stat. 210/5.4(a)(15). The exhibitors' rights provision states, in relevant part:

> All [MPEA] contracts with exhibitors, contractors, and managers shall include the following minimum terms and conditions:
>
> (1) Consistent with safety and the skills and training necessary to perform the task, as determined by the [MPEA], an exhibitor and exhibitor employees are permitted in a booth of any size with the use of the exhibitor's ladders and hand tools to:
>
>> (i) set-up and dismantle exhibits displayed on [MPEA] premises;
>> (ii) assemble and disassemble materials, machinery, or equipment on [MPEA] premises; and
>> (iii) install all signs, graphics, props, balloons, other decorative items, and the exhibitor's own drapery, including the skirting of exhibitor tables, on the [MPEA]'s premises.
>
> (2) An exhibitor and exhibitor employees are permitted in a booth of any size to deliver, set-up, plug in, interconnect, and operate an exhibitor's electrical equipment, computers, audio-visual devices, and other equipment.
>
> (3) An exhibitor and exhibitor employees are permitted in a booth of any size to skid, position, and re-skid all exhibitor material, machinery, and equipment on [MPEA] premises.
>
> . . . .
>
> (5) The [MPEA] shall designate areas, in its discretion, where exhibitors may unload and load exhibitor materials from privately owned vehicles at [MPEA] premises with the use of non-motorized hand trucks and dollies.
>
> (6) On Monday through Friday for any consecutive 8-hour period during the hours of 6:00 a.m. and 10:00 p.m., union employees on [MPEA] premises shall be paid

straight-time hourly wages plus fringe benefits. Union employees shall be paid straight-time and a half hourly wages plus fringe benefits for labor services provided after any consecutive 8-hour period; provided, however, that between the hours of midnight and 6:00 a.m. union employees shall be paid double straight-time wages plus fringe benefits for labor services.

. . . .

(8) On Saturdays for any consecutive 8-hour period, union employees on [MPEA] premises shall be paid straight-time and a half hourly wages plus fringe benefits. After any consecutive 8-hour period, union employees on [MPEA] premises shall be paid double straight-time hourly wages plus fringe benefits; provided, however, that between the hours of midnight and 6:00 a.m. union employees shall be paid double straight-time wages plus fringe benefits for labor services.

. . . .

(10) On Sundays and on State and federal holidays, union employees on [MPEA] premises shall be paid double straight-time hourly wages plus fringe benefits.

 . . . .

(12) The [MPEA] has the power to determine, after consultation with the Advisory Council, the work jurisdiction and scope of work of union employees on [MPEA] premises during the move-in, move-out, and run of a show, provided that any affected labor organization may contest the Authority's determination through a binding decision of an independent, third-party arbitrator. When making the determination, the [MPEA] or arbitrator, as the case may be, shall consider the training and skills required to perform the task, past practices on [MPEA] premises, safety, and the need for efficiency and exhibitor satisfaction. These factors shall be considered in their totality and not in isolation. Nothing in this item permits the [MPEA] to eliminate any labor organization representing union employees that provide labor services on the move-in, move-out, and run of the show as of the effective date of this amendatory Act of the 96th General Assembly.

(13) During the run of a show, all stewards of union employees shall be working stewards. Subject to the discretion of the [MPEA], no more than one working steward per labor organization representing union employees providing labor services on [MPEA] premises shall be used per building and per show.

(14) An exhibitor or show manager may request by name specific union employees to provide labor services on [MPEA] premises consistent with all State and federal laws.  Union employees requested by an exhibitor shall take priority over union employees requested by a show manager.

> . . . .
>
> (16) Crew sizes for any task or operation shall not exceed 2 persons unless, after consultation with the Advisory Council, the [MPEA] determines otherwise based on the task, skills, and training required to perform the task and on safety.
>
> . . . .
>
> (19) A show manager or contractor shall charge an exhibitor only for labor services provided by union employees on [MPEA] premises on a minimum half-hour basis.

70 Ill. Comp. Stat. 210/5.4(c)(1)-(3), (5)-(6), (8), (10), (12)-(14), (16), (19). These provisions differ in some respects from those in the Trade Show, Area and Side Letter Agreements and the Local 727-MPEA CBA. (*See* Defs.' Resp. Carpenters' LR 56.1(a) Stmt. Facts ¶¶ 24-34; Defs.' Resp. Local 727's LR 56.1(a) Stmt. Facts ¶¶ 7-13, 15-18.)

In its first amended complaint, Local 727 alleges that subsections 1-3, 5-6, 12-14, 16 and 19 of section 5.4(c) as applied to the Local 727-MPEA CBA and the Trade Show Agreement are preempted by the National Labor Relations Act ("NLRA") (Count III), violate the U.S. Constitution (Counts I, II, IV & VIII) and state law (Counts V-VII). In its second amended complaint, Carpenters allege that subsections 1-3, 6, 8, 10 and 12-14 as applied to the Area and Side Letter agreements are preempted by the National Labor Relations Act (Counts I & II), violate the U.S. Constitution (Counts III-VI)[2] and state law (Counts VII & VIII). Both plaintiffs seek declaratory and injunctive relief.[3]

---

[2]Carpenters have, with defendants' consent, dismissed their Count IV Contracts Clause claim. (*See* Carpenters' LR 56.1(a) Stmt. Facts ¶ 38; *id.*, Ex. I, Decl. McGann ¶ 3; Defs.' Resp. Carpenters' LR 56.1(a) Stmt. Facts ¶ 38.)

[3]Apparently, plaintiffs have abandoned their 42 U.S.C. § 1983 claims for money damages because they do not address them in the summary judgment motions. In any event, these claims fail as a matter of law because the MPEA is not amenable to suit under § 1983 and cannot be sued for damages in federal court. *See Will v. Mich. Dept. of State Police*, 491 U.S. 58, 64 (1989) ("[W]e reaffirm today . . . that a State is not a person within the meaning of § 1983."); *Kentucky v. Graham*, 473 U.S. 159, 169 (1985) (stating that "the Eleventh Amendment bars a

**Discussion**

To prevail on a summary judgment motion, each movant must show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). At this stage, we do not weigh evidence or determine the truth of the matters asserted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). We view all evidence and draw all inferences in favor of the non-moving party. *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692 (7th Cir. 2000). Summary judgment is appropriate only when the record as a whole establishes that no reasonable jury could find for the non-moving party. *Id.*

**The Local 727-MPEA CBA**

Local 727 has standing to challenge section 5.4(c) as applied to the Local 727-MPEA CBA only if its members who are subject to that agreement, *i.e.*, those employed as receiving clerks and assistant supervisors by MPEA, are likely to be harmed by the section. *See Pollack v. U.S. Dep't Of Justice*, 577 F.3d 736, 739 (7th Cir. 2009). The record establishes that they are not. By its terms, section 5.4(c) applies only to union workers "who provid[e] skilled labor services to exhibitors, a show manager, or a show contractor on [MPEA] premises." 70 Ill. Comp. Stat. 210/5.4(a). It is undisputed that "MPEA employees represented by Local 727 and covered by [the Local 727-MPEA CBA] . . . perform work for MPEA and do not provide services to exhibitors or show managers." (Local 727's Resp. Defs.' Stmt. Add'l Facts ¶ 42.) Because the undisputed facts show that section 5.4(c) does not even apply to, let alone harm, Local 727 members employed by MPEA, Local 727 does not have standing to challenge the statute's application to the Local 727-

damages action against a State in federal court.").

MPEA CBA. Defendants, therefore, are entitled to judgment as a matter of law on Local 727's claims that section 5.4(c), as applied to that agreement, violates the U.S. Constitution or is preempted by the NLRA.

**Trade Show, Area & Side Letter Agreements**

Plaintiffs argue that the contested provisions of section 5.4(c) as applied to the Trade Show, Area and Side Letter Agreements are preempted by the National Labor Relations Act ("NLRA") pursuant to either *San Diego Building Trades Council v. Garmon*, 359 U.S. 236 (1959) or *Lodge 76, International Association of Machinists & Aerospace Workers, AFL-CIO v. Wisconsin Employment Relations Commission*, 427 U.S. 132, 140-41 (1976) ("*Machinists*"). The *Garmon* doctrine bars states from regulating labor issues that fall within the National Labor Relations Board's exclusive jurisdiction. 359 U.S. at 244-45. The *Machinists* doctrine bars states from regulating labor issues that Congress intended to be determined by market forces, not legislation. 427 U.S. at 140-41. "A State does not regulate, however, simply by acting within one of these protected areas." *Bldg. & Constr. Trades Council of the Metro. Dist. v. Assoc. Builders & Contractors of Mass./R.I., Inc.*, 507 U.S. 218, 227 (1993) ("*Boston Harbor*"). When a state acts as a market participant rather than a regulator, its action is not subject to either preemption doctrine. *Id.*; *N. Ill. Chapter of Associated Builders & Contractors, Inc. v. Lavin*, 431 F.3d 1004, 1005 (7th Cir. 2005).

The Supreme Court explored the difference between market participation and regulation in *Wisconsin Department of Industry, Labor & Human Relations v. Gould, Inc.*, 475 U.S. 282 (1986). The plaintiff in that case claimed that a Wisconsin statute barring the state from doing business

10

with repeat NLRA violators, even if the violations occurred in another state or in connection with private sector work, was preempted under *Garmon*. *Id.* at 283-85. Wisconsin contended that the statute was "an exercise of the State's spending power," and thus could not be "regulation" subject to preemption. *Id.* at 287.

The Supreme Court rejected Wisconsin's narrow definition of "regulation." The *Garmon* doctrine, it said, "is designed to prevent conflict in its broadest sense with the complex and interrelated federal scheme of law, remedy, and administration." *Id.* at 286. Thus, it bars states from "setting forth standards of conduct inconsistent with the substantive requirements of the NLRA [and] from providing their own . . . remedies for conduct prohibited or arguably prohibited by [it]." *Id.* In the Court's view, the Wisconsin statute "function[ed] unambiguously as a supplemental sanction" for NLRA violations, and thus, conflicted with the federal regulatory scheme. *Id.* at 288.

The Court also confronted the regulation/participation distinction in *Boston Harbor*. In that case, a group of non-union construction workers challenged a bid specification adopted by the Massachusetts agency ("MWRA") in charge of a Boston Harbor clean-up project. 507 U.S. at 221. The specification required all bidders to abide by the MWRA's contract with a construction workers union, which mandated that all project employees join the union, required the agency to use the union's hiring halls and set forth binding dispute resolution procedures. *Id.* at 223. Relying on *Gould*, plaintiff argued that the specification was a regulation of labor-management relations that was preempted by the NLRA. *Id.* The Supreme Court disagreed:

> The conduct at issue in *Gould* was a state agency's attempt to compel conformity with the NLRA. Because the statute at issue in *Gould* addressed employer conduct unrelated to the employer's performance of contractual obligations to the State, and because the State's reason for such conduct was to deter NLRA violations, we

> concluded: "Wisconsin 'simply is not functioning as a private purchaser of services,' . . . [and therefore,] for all practical purposes, Wisconsin's debarment scheme is tantamount to regulation."
>
> . . . .
>
> Bid Specification 13.1 is not government regulation . . . . [It is] proprietary conduct on the part of the Commonwealth of Massachusetts, which legally has enforced a valid project labor agreement. As Chief Judge Breyer aptly noted in his dissent in the Court of Appeals, "when the MWRA, acting in the role of purchaser of construction services, acts just like a private contractor would act, and conditions its purchasing upon the very sort of labor agreement that Congress explicitly authorized and expected frequently to find, it does not 'regulate' the workings of the market forces that Congress expected to find; it exemplifies them." 935 F.2d at 361.

*Id.* at 228-29, 32-33.

The legislation at issue here ("section 5.4(c)") is permissible market participation, as in *Boston Harbor*, rather than preempted regulation, as in *Gould*, if it "advance[s] or preserve[s] the state's proprietary interest in a project or transaction, as an investor, owner, or financier" and is "specifically tailored" to that interest. *Hotel Emps. & Rest. Emps. Union, Local 57 v. Sage Hospitality Res., LLC*, 390 F.3d 206, 215-16 (3d Cir. 2004) (quotation omitted); *see Metro. Milwaukee Ass'n of Commerce v. Milwaukee Cnty.*, 431 F.3d 277, 278 (7th Cir. 2005) ("[I]f the state is intervening in the labor relations just of firms from which it buys services, and it is doing so in order to reduce the cost or increase the quality of those services rather than to displace the authority of the National Labor Relations Act and the National Labor Relations Board, there is no preemption.").

Defendants say section 5.4(c) is akin to the ordinance held to be proprietary conduct in *Sage*. In that case, a development agency comprised of the City of Pittsburgh, the School District of Pittsburgh and Allegheny County ("URA") agreed to issue Tax Increment Financing ("TIF") bonds to finance Sage's development of a hotel. 390 F.3d at 208 & n.1. Thereafter, the city

enacted an ordinance that required anyone who employed hospitality workers in a TIF project to execute a CBA that barred strikes, required arbitration of disputes and expired only after the TIF funds were repaid or the employer's agreement with the city expired. *Id.* at 209. Sage entered into such an agreement but refused to arbitrate a dispute that arose under it. *Id.* When the union moved to compel arbitration, Sage argued that the agreement was void because the ordinance that compelled Sage to enter into it was preempted by the NLRA. *Id.* at 210. The district court granted the union's motion, and Sage appealed. *Id.*

The Third Circuit affirmed, saying:

The City has an economic interest . . . . in the projected stream of increased tax revenue [it] hopes to receive if the [TIF] project is successful. [But] [t]his kind of economic interest is governmental, not proprietary, because it is not comparable to the financial interest that an ordinary market participant has in a project. Rather, the City's interest is simply the traditional government interest in enhanced revenue that applies anytime the City seeks to increase its tax base.

. . . .

[The] Ordinance[, however,] is not designed simply to protect the City's interest in tax revenues. To be sure, as described above, under the TIF program, forty percent of any increased tax revenues flow to the City and other government entities. . . . But the City is also a constituent in the URA . . . . [and thus,] is a partner in the proprietary interests of the URA itself. And the URA as issuer of the TIF bonds has a proprietary financial interest in the TIF development project that is the same as that of any (nonprofit) private entity that finances a development by issuing bonds.

*Id*. at 216-17.

Like the city in *Sage*, the state has a proprietary interest in the MPEA that it has tried to protect by setting the terms of certain employment relationships. The ordinance in *Sage*, however, is far more limited than section 5.4(c) because it applies only to TIF fund recipients, governs only their relations with employees working on the TIF project and does so only until the TIF funds are repaid. *Sage*, 390 F.3d at 208-09. Section 5.4(c), on the other hand, sets the wages, hours and work

13

rules for "[all] union employees on [MPEA] premises" *except* those employed by MPEA and has no sunset provision. *See* 70 Ill. Comp. Stat. 210/5.4(a), (c)(6)-(13) (stating that its terms apply to "union employees" who "provid[e] skilled labor services to exhibitors, a show manager, or a show contractor on [MPEA] premises"); (Local 727's Resp. Defs.' Stmt. Add'l Facts ¶ 42 (admitting that union workers employed by MPEA "perform work for MPEA and do not provide services to exhibitors or show managers")). Thus, it controls only the private employment relations between union workers and contractors/EACs and, absent repeal, will do so permanently.

Despite its breadth, it is not clear that section 5.4(c) advances the state's goal of reducing exhibitors' costs. The record shows that exhibitors do not pay directly for union work but are billed for it by show contractors and EACs. (Carpenters' Resp. Defs.' Stmt. Add'l Facts ¶ 7; Local 727's Resp. Defs.' Stmt. Add'l Facts ¶¶ 3-9; Local 727's LR 56.1(a) Stmt. Facts, Ex. O, Jt. Comm. MPEA, Teamsters Local 727 Fact Sheet; *id.*, Ex. Z & Mem. Resp. Carpenters' Mot. Prelim. Inj., Ex. B, Board Report § 2.) Section 5.4(c) reduces those entities' labor costs by capping the number of worker hours subject to premium pay. *See* 70 Ill. Comp. Stat. 210/5.4(c)(6), (8), (10). It does not, however, cap the mark-ups those entities can apply to the labor charges before passing them onto the exhibitors. *See* 70 Ill. Comp. Stat. 210/5.4(c)(7), (9), (11), (e) (allowing contractors to add "reasonable" mark-ups to statutory rates that "fairly pass[]" cost reductions onto exhibitors). As a result, the extent, if any, to which the statute achieves its asserted goal is left largely to the contractors' discretion.

Assuming, arguendo, that Section 5.4(c) meaningfully reduces exhibitor costs, a point the record does not support or refute, it would still constitute market participation only if it were a narrowly-tailored means to that end. The record does not suggest that it is. On the contrary, the

14

record shows that there are a number of other ways for the state to reach that goal that intrude less on private labor relations, including: (1) limiting contractor and EAC mark-ups on labor; (2) reducing or eliminating any profit MPEA derives from facility rentals and parking services; (3) creating financial incentives for existing trade show customers to stay in Chicago; (4) leasing excess MPEA space for non-trade show use; (5) eliminating MPEA's subsidy of the CCTB; (6) privatizing some or all of MPEA's operations; and (7) streamlining MPEA's governance structure. (*See* Local 727's LR 56.1(a) Stmt. Facts, Ex. Z & Mem. Resp. Carpenters' Mot. Prelim. Inj., Ex. B, Board Report §§ 2-3, 5; Local 727's LR 56.1(a) Stmt. Facts, Ex. O, Jt. Comm. MPEA, Teamsters Local 727 Fact Sheet; *id.*, Ex. AA, 4/7/10 Jt. Comm. MPEA, Testimony Teamsters Jt. Council; Defs.' Mem. Resp. Carpenters' Mot. Prelim. Inj., Ex. D, 3/23/10 Mem.; Defs.' Resp. Local 727's Mot. Prelim. Inj., Ex. B4, 4/28/10 MPEA Legislative Analysis C.H. Johnson Consulting, Inc.; *id.*, Ex. D1, Chicago Convention Crisis: A Vacuum of Leadership in the Hospitality Industry, UNITE HERE Local 1.) But there is no evidence to suggest that the state considered acting on any of them instead of, or as a precursor to, enacting section 5.4(c). Thus, defendants have not created a triable issue as to whether, let alone established that, the contested provisions of section 5.4(c) are a narrowly-tailored means to the end of reducing exhibitors' labor costs.[4]

Because the record establishes that the contested provisions of section 5.4(c) are regulatory in nature, they are preempted if they govern activities that: (1) are actually or arguably prohibited or protected by §§ 7 and 8 of the NLRA (*Garmon*); or (2) Congress intended to remain unregulated

---

[4] Given the rationale for the market participant exception, that a state can "pursue[] its purely proprietary interests" in the same manner as a private entity, *Boston Harbor*, 507 U.S. at 231-32, it is not surprising that section 5.4(c) fails to measure up. Though a private convention facility could increase its competitiveness in a number of ways, telling contractors who are hired by its customers, and its customers' customers, how much they can pay their employees is not one of them.

(*Machinists*). *Boston Harbor*, 507 U.S. at 225-26. As relevant here, §§ 7 and 8 protect employees' right to unionize and bargain collectively "with respect to wages, hours, and other terms and conditions of employment." 29 U.S.C. §§ 157, 158(a)(5), (d). The provisions of section 5.4(c) that one or both plaintiffs contest: (1) set union members' wages and hours (subsections 6, 8, 10 and 19); (2) change union work jurisdictions and assignments or give MPEA the right to do so (subsections 1-3, 5, 12 and 13); (3) change the union work referral system (subsection 14); and (4) allow MPEA to determine the number and kind of tradesman required to perform tasks safely (subsections 1-3, 12 and 16). (*See* Defs.' Resp. Local 727's LR 56.1(a) Stmt. Facts ¶¶ 7, 9-13, 15, 17-18, 34; Defs.' Resp. Carpenters' LR 56.1(a) Stmt. Facts ¶¶ 14-15, 24-27, 33-35; Defs.' Stmt. Add'l Facts [Carpenters] ¶ 59; Carpenters' Mot. Prelim. Inj., Ex. B, McLaughlin Aff. ¶ 5; *id.*, Ex. C, Area Agreement §§ 1.1, 22.1-26.13; *id.*, Ex. E, Labor Agreement; Local 727's Mot. Prelim. Inj., Ex. B, Trade Show Agreement §§ 2.1, 5.3, 14.1, 14.3, 26.1 & Letter of Understanding.) All of these issues are mandatory subjects of collective bargaining protected by § 8 of the NLRA. 29 U.S.C. § 158(a)(5), (b)(3), (d) (requiring employers and unions to bargaining collectively, *i.e.*, "to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment"); *The Idaho Statesman v. N.L.R.B.*, 836 F.2d 1396, 1400 (D.C. Cir. 1988) (stating that § 8 protects mandatory, but not permissive, subjects of bargaining); *see Pierce v. Commonwealth Edison*, 112 F.3d 893, 896 (7th Cir. 1997) ("Safety on the job is a mandatory subject of collective bargaining . . . ."); *Hill-Rom Co. v. N.L.R.B.*, 957 F.2d 454, 457 (7th Cir. 1992) ("[T]ransfer of work out of a [bargaining] unit . . . constitutes a mandatory subject of bargaining."); *id.* at 460 (J. Easterbrook, dissenting) ("Assignment of work . . . is a mandatory subject of bargaining."); *Boise Cascade Corp. v. N.L.R.B.*, 860 F.2d 474 (D.C. Cir. 1988) (stating that work

jurisdiction is a mandatory subject of bargaining); *N.L.R.B. v. Houston Chapter, Associated Gen. Contractors of Am., Inc.*, 349 F.2d 449, 452-53 (5th Cir. 1965) (stating that work referral system is a mandatory bargaining subject for construction trades). Thus, as applied to the Trade Show, Area and Side Letter Agreements, the contested provisions of section 5.4(c) regulate issues protected by § 8 of the NLRA and are, therefore, preempted under *Garmon*.[5]

**State Claims**

Having dismissed all of the federal claims in these suits, the Court declines to exercise supplemental jurisdiction over the state law claims asserted in Counts V-VII of Local 727's First Amended Complaint and Counts VII and VIII of Carpenters' Second Amended Complaint. *See* 28 U.S.C. § 1367(c).

**Conclusion**

For the reasons set forth above, the Court:

(1) dismisses with prejudice Count IV of Carpenters' Second Amended Complaint, at the parties' request;

(2) finds that there is no genuine issue of material fact as to Local 727's claims that section 5.4(c)(1)-(3), (5)-(6), (12)-(14), (16), (19): (a) as applied to the Local 727-MPEA CBA violate the U.S. Constitution or are preempted by the NLRA, and defendants are entitled to judgment as a matter of law on these claims; (b) as applied to the Trade Show Agreement are preempted by the NLRA, and Local 727 is entitled to a judgment as a matter of law on this claim;

(3) finds that there is no genuine issue of material fact as to Carpenters' claim that section 5.4(c)(1)-(3), (6), (8), (10), (12)-(14) as applied to the Area and Side Letter

---

[5]This determination renders moot plaintiffs' constitutional challenges to the application of the contested provisions of section 5.4(c) to the Trade Show, Area and Side Letter Agreements.

17

Agreements are preempted by the NLRA under *Garmon*, and Carpenters is entitled to judgment as a matter of law on this claim;

(4) declares that section 5.4(c) (1)-(3), (5)-(6), (12)-(14), (16), (19) as applied to the Trade Show Agreement and section 5.4(c)(1)-(3), (6), (8), (10), (12)-(14) as applied to the Area and Side Letter Agreements are preempted by the NLRA;

(5) enjoins defendants from enforcing section 5.4(c) (1)-(3), (5)-(6), (12)-(14), (16), (19) as to the Trade Show Agreement and section 5.4(c)(1)-(3), (6), (8), (10), (12)-(14) as to the Area and Side Agreements;

(6) grants in part, denies in part and strikes as moot in part Local 727's motion for summary judgment on its First Amended Complaint [doc. 71], as follows: (a) grants it as to the portion of Count III alleging that section 5.4(c) (1)-(3), (5)-(6), (12)-(14), (16), (19) as applied to the Trade Show Agreement are preempted by the NLRA; (b) denies it as to Count II and the portions of Counts III-IV and VIII that challenge the application of section 5.4(c) (1)-(3), (5)-(6), (12)-(14), (16), (19) to the Local 727-MPEA CBA; and (c) strikes it as moot as to Count I and the portions of Counts IV and VIII that challenge the constitutionality of applying section 5.4(c) (1)-(3), (5)-(6), (12)-(14), (16), (19) to the Trade Show Agreement;

(7) grants in part, denies in part and strikes as moot in part defendants' motion for summary judgment on Local 727's First Amended Complaint [doc. 80], as follows: (a) grants it as to Count II and the portions of Counts III-IV and VIII that challenge the application of section 5.4(c)(1)-(3), (5)-(6), (12)-(14), (16), (19) to the Local 727-MPEA CBA; (b) denies it as to the portion of Count III alleging that section 5.4(c)(1)-(3), (5)-(6), (12)-(14), (16), (19) as applied to the Trade Show Agreement are preempted by the NLRA; and (c) strikes it as moot as to Count I and the portions of Counts IV and VIII that challenge the constitutionality of section 5.4(c)(1)-(3), (5)-(6), (12)-(14), (16), (19) as applied to the Trade Show Agreement;

(8) grants in part and strikes as moot in part Carpenters' motion for summary on its Second Amended Complaint [doc. 95], as follows: (a) grants it as to Count II; and (b) strikes it as moot as to Counts I and III-VI;

(9) denies in part and strikes as moot in part defendants' motion for summary judgment on Carpenters' Second Amended Complaint [doc. 103], as follows: (a) denies it as to Count II; and (b) strikes it as moot as to Counts I and III-VI;

(10) declines to exercise supplemental jurisdiction over the state law claims asserted in Counts V-VII of Local 727's First Amended Complaint, which are dismissed without prejudice to being filed in state court;

(11) declines to exercise supplemental jurisdiction over the state law claims asserted in Counts VII and VIII of Carpenter's Second Amended Complaint, which are dismissed without prejudice to being filed in state court;

(12) strikes as moot defendants' motion to dismiss Count VII of Carpenters' Second Amended Complaint [doc. 65];

(13) strikes as moot defendants' motion to dismiss Count VI of Local 727's Complaint and First Amended Complaint [doc. 46 & 66].

**SO ORDERED.**  **ENTERED:   March 31, 2011**

**HON. RONALD A. GUZMAN**
**United States District Judge**